## Robert R. CORTINEZ *v.* SUPREME COURT COMMITTEE ON PROFESSIONAL CONDUCT

97-789                                    966 S.W.2d 251

Supreme Court of Arkansas
Opinion delivered April 9, 1998

*The Cortinez Law Firm, P.L.L.C.,* by: *Christopher D. Anderson;* and *Hugh D. Brown,* for appellant.

*William S. Roach,* for appellee.

DAVID NEWBERN, Justice. Robert R. Cortinez, Sr., appeals from a decision of the Arkansas Supreme Court Committee on Professional Conduct ("Committee") to issue a letter of caution to him after finding him in violation of Rule 1.16(d) of the Model Rules of Professional Conduct. In its letter opinion, the Committee wrote that, upon termination of the attorney-client relationship, Mr. Cortinez did not invite his client, Anthony David, to discuss the legal consequences of his decision to end the relationship and did not return to Mr. David documents belonging to Mr. David. We affirm.

In January 1993, Mr. David's civilian employment with the Pine Bluff Arsenal, a Department of the Army installation, was terminated on the basis that he falsified his employment application. In response to a question on his employment application, Mr. David stated that he had not been convicted by a court martial. Arsenal personnel concluded, following an investigation, that the statement was false. It was later determined that, although Mr. David had received a non-judicial punishment for two counts of showing disrespect toward Petty Officers while serving in the United States Navy, he had not been convicted by a court martial.

Following his termination, Mr. David applied for and was denied unemployment benefits by the Employment Security Division of the Arkansas Labor Department. The basis of the denial was that Mr. David had been discharged for providing false information on his employment application.

On April 15, 1993, Mr. David consulted Mr. Cortinez concerning his termination and the subsequent denial of benefits. At the April 15 meeting, Mr. David and Mr. Cortinez discussed appealing the denial of unemployment benefits and suing the Arsenal for wrongful discharge. There was evidence that Mr. David gave Mr. Cortinez his termination letter from the Arsenal and an official "court memorandum" regarding the non-judicial punishment. Mr. David paid Mr. Cortinez $100 which, he

thought, was for agreeing to represent him in the wrongful-discharge action.

Mr. Cortinez argued that he only agreed to investigate the case. According to Mr. David, Mr. Cortinez advised him that the best course of action would be first to resolve the appeal of the denial of unemployment benefits and then to proceed slowly in the wrongful-discharge case to maximize the recovery. Mr. David agreed that Mr. Cortinez would represent him in the unemployment-compensation case for a fee of $350 contingent upon winning an award. Mr. Cortinez stated that Mr. David then signed a wrongful-discharge representation contract and one for representation with respect to the unemployment benefits. The contracts are part of the record. On the contract for the wrongful-discharge case, the phrase "$100 retainer for investigation only" is handwritten under the typed words "contingent upon recovery," preceded by a checked box. In his affidavit, Mr. David asserted that he did not have a written fee contract with Mr. Cortinez but that they agreed that the wrongful-discharge case was on a contingency basis.

On April 16, 1993, Mr. Cortinez wrote a letter to the Director of Civilian Personnel at the Arsenal. In the letter, Mr. Cortinez stated that he was representing Mr. David in regard to his job termination. He also stated in the letter that Mr. David had received non-judicial punishment while on active duty with the United States Navy but that he had not been convicted by a military court martial. Mr. Cortinez closed the letter by saying that he looked forward to a response "to this interesting wrongful discharge case."

On April 20, 1993, the Cortinez Law Firm sent Mr. David a letter of representation, stating that the attorney's fee would be on a contingency-fee basis, to Mr. David. The letter, which was entitled "Wrongful Discharge & Unemployment Compensation," welcomed Mr. David as a client and stated that the firm would receive its fee when the case was settled.

On May 4, 1993, the Deputy Command Judge Advocate of the Arsenal responded to Mr. Cortinez's April 16 letter. In his response, the Deputy Command Judge Advocate provided

grounds for Mr. David's termination different from those originally recited. He wrote that Mr. David

> . . . failed to properly respond to question 42 wherein it asked if he had ever forfeited any collateral. His Response in checking the *No Block* is in conflict with the disposition of the record of charges regarding his violation of two specifications of the Uniform Code of Military Justice (UCMJ) . . . . These Charges resulted in Mr. David's forfeiting $150.00 pay per month for 2 months and his reduction in rank to E2 (suspended for 6 months).

According to Mr. Cortinez, he decided not to pursue the termination matter because the Arsenal's decision to fire Mr. David would be difficult to set aside.

On May 5, 1993, an unemployment-compensation hearing was held in which Mr. Cortinez represented Mr. David, successfully as it later turned out. According to Mr. Cortinez, he wrote a memo-letter on May 6, 1993, which was sent to Mr. David, in which he advised Mr. David that he would not pursue the termination matter but hoped they would get a favorable decision on the unemployment compensation. A copy of the handwritten memo-letter appears in the record. Mr. Cortinez stated that he enclosed a copy of the Deputy Command Judge Advocate's May 4 letter, but the memo-letter does not show a reference of any sort to an enclosure. At the Committee hearing, Mr. David denied receiving the letter.

On May 14, 1993, Mr. David paid $350 to Mr. Cortinez per the agreement on the unemployment-compensation case. The words "wrongful discharge" were written on the receipt he received for the $350. In his affidavit, Mr. Cortinez stated that his secretary, Jackie Evans, inadvertently wrote "wrongful discharge" on the receipt.

Mr. Cortinez stated that he did not hear from Mr. David between May 5, 1993, and November 1995. However, there is certainly evidence to support the Committee's findings that, over the next two and a half years, Mr. David made periodic calls to the Cortinez Law Firm to learn the status of his wrongful-discharge case. According to Mr. David, he called Mr. Cortinez's Pine Bluff

office at least once every three months between May 1993 and June 1995 for a status report.

Mr. David stated that, in June 1995, he left a message for Mr. Cortinez at his Little Rock office in which he inquired about the status of the wrongful-discharge case. According to Mr. David, Mr. Cortinez then left a message for him on his answering machine. The message was that, if Mr. Cortinez had known that Mr. David wanted to know about the wrongful-discharge case, he would have brought the records from Pine Bluff. Mr. David stated that, in August 1995, at Mr. Cortinez's secretary's recommendation, he spoke with Joel Smith at the firm. Mr. David stated that Mr. Smith was to look for his records in the firm's Pine Bluff office, but the Pine Bluff office said that his records were at the Little Rock office.

According to Mr. David, in September 1995, Mr. Smith told him that his wrongful discharge was not pursued because his $350 fee had not been paid. Mr. David stated that, in October 1995, Mr. Smith told him that he would get back with him later because he could not find his records but that he owed $350. Mr. David stated that he called Mr. Smith again and that Mr. Smith told him that the firm's files showed that he had not paid the $350 fee. Mr. David stated that he told Mr. Smith that he had a receipt for the $350 and that Mr. Smith said he would check on it. In his affidavit, Mr. Smith stated that he only spoke to Mr. David on one occasion in November 1995; however, at the hearing, Mr. Smith, responding to questions from the Committee, admitted that he remembered conversations with Mr. David.

At the hearing, Mr. David provided the following testimony regarding his attempts to contact Mr. Cortinez:

> His son — he tried to look for my records. He said would I call to Little Rock. I called from Jefferson Heights to Little Rock and he said that, "Your records aren't right here, but I will try to find them. Call back later." I finally called back later and he said, "I don't know where your records are. They might be in the Pine Bluff office."

****

And I said, "Well, I'm the Pine Bluff Arsenal case in Pine Bluff and I can't get in contact with Mr. Cortinez here." So they said, "Later. Call back later." All I kept — did was call back later. I talked to Joel Smith. I explained to him my situation and he said well, he couldn't help me but Mr. Cortinez would be in later. Call back. I called back and Mr. Cortinez was never in . . . .

Mr. David stated that, in November 1995, he called the firm and that Mr. Smith transferred his call to Mr. Cortinez. According to Mr. David, Mr. Cortinez told him that he did not pursue the wrongful-discharge claim because he had not paid the $350. Mr. David stated that he asked Mr. Cortinez whether he would have pursued the case if he had paid him the $350 from the unemployment case. According to Mr. David, Mr. Cortinez responded in the affirmative. Mr. David stated that, when he told Mr. Cortinez that he had a receipt for the $350, Mr. Cortinez told him to fax a copy of the receipt. Mr. David stated that Mr. Cortinez hung up on him when he asked how Mr. Smith knew that he still owed $350 when he could not find his records.

According to Mr. Cortinez, Mr. David persisted in attempting to force him to agree that he did not pursue his wrongful-discharge case because he did not pay the $350 fee. Mr. Cortinez further stated that he told Mr. David that he did not agree to represent him in the wrongful-discharge case and that the contract that he signed stated that Mr. Cortinez would investigate the termination.

In his affidavit, Mr. Cortinez stated that the $350 payment was not documented in the Little Rock bookkeeping system and that, consequently, both files were closed by the Pine Bluff office with no documentation of the fees being paid.

At the hearing, Mr. Cortinez stated that he told Mr. David that he should check with another attorney regarding whether his claim had any merit; however, there is nothing to that effect in the memo-letter by which he purportedly declined to represent Mr. David on the wrongful-discharge claim. Mr. Cortinez stated that he did not invite Mr. David to his office so that he could answer any questions regarding his decision not to continue with the case. He stated that he did not return Mr. David's termination letter

from the Arsenal. Other documents in the wrongful-discharge file include a blank employment-application form and the court memorandum regarding Mr. David's non-judicial violation.

Model Rule 1.16(d) states as follows:

> Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advance payment of fee that has not been earned. The lawyer may retain papers relating to the client to the extent permitted by other law.

We review a decision of the Supreme Court Committee on Professional Conduct *de novo* on the record and pronounce judgment as if our opinion had been rendered by the Committee. *Fink v. Neal*, 328 Ark. 646, 945 S.W.2d 916 (1997). We affirm the Committee's action unless it is clearly against the preponderance of the evidence and do not reverse the Committee's findings unless they are clearly erroneous. *Id. See also Colvin v. Committee on Professional Conduct*, 309 Ark. 592, 832 S.W.2d 246 (1992); *Muhammad v. Committee on Professional Conduct*, 291 Ark. 29, 722 S.W.2d 280 (1987). The Committee is in the superior position to determine the credibility of the witnesses and weigh the preponderance of the evidence. *Colvin v. Committee on Professional Conduct, supra.*

### 1. Application of Model Rule 1.16(d)

Mr. Cortinez argues that Model Rule 1.16(d), which applies "[u]pon termination of representation," does not impose any duty on him because he never represented Mr. David in the wrongful-termination case, and, instead, limited his involvement in the matter to investigating the facts to determine whether he would be willing to take the case. He further argues that he completed his attorney-client agreement with Mr. David when he conducted his investigation and sent the memo-letter to Mr. David.

In support of his argument, Mr. Cortinez refers to his wrongful-discharge contract with Mr. David. On the contract,

Mr. Cortinez wrote "$100.00 retainer for investigation only." Mr. Cortinez also refers to (1) Model Rule 1.2(c), which allows a limitation of representation; (2) Model Rule 3.1, which prohibits a lawyer from pursuing frivolous claims; and (3) Ark. R. Civ. P. 11, which requires an attorney to make a reasonable inquiry as to both the factual and legal basis for a pleading, motion, or other document before filing with the court.

At this point we need only say that there was before the Committee evidence that Mr. Cortinez did not continue to work on the wrongful-discharge case because he thought that Mr. David owed him $350 as a retainer for the wrongful-discharge case.

■ Whether Mr. Cortinez limited his contract of representation was a question of fact to be decided by the Committee. Based upon the evidence before it, the Committee could have concluded that an attorney-client relationship was formed with respect to the wrongful-discharge claim and that Mr. Cortinez did not pursue to its conclusion the "interesting" wrongful-discharge claim that presumably became even more interesting when the Arsenal changed its reason for discharging Mr. David.

### 2. Failure to surrender papers

#### a. Procedural due process

Mr. Cortinez also challenges the Committee's decision on the basis that he was deprived of due process because he was not given sufficient notice that the Committee planned to consider his alleged failure to return Mr. David's file as a potential violation of the Model Rules.

In his affidavit to the Committee, Mr. David alleged that Mr. Cortinez violated Model Rule 1.16(d). Additionally, in the Committee's April 30, 1996 letter to Mr. Cortinez in which it informed Mr. Cortinez of the claims against him, the Committee wrote that the allegations implicated several specific rules, including Model Rule 1.16(d). Mr. Cortinez was again informed that he was charged with violating Model Rule 1.16(d) at the beginning of the hearing before the Committee on November 8, 1996.

Mr. Cortinez argues that he had no notice that the Committee intended to consider whether his alleged failure to return Mr. David's file to him constituted a violation of Model Rule 1.16(d) because the Committee's April 30 letter did not specify which of the four parts of Model Rule 1.16(d) Mr. Cortinez allegedly violated. He further argues that it was not apparent from Mr. David's affidavit that the Committee intended to consider his alleged failure to return Mr. David's file because Mr. David did not complain in his affidavit that Mr. Cortinez failed to return his file to him.

■ The Committee's reference to Model Rule 1.16(d) was sufficient notice that the failure to return the client's papers was at issue. The Rule provides several examples of steps that an attorney must take to protect a client's interest upon termination of representation, including the return of the client's papers to the client. Mr. Cortinez should have been prepared to establish his compliance with all aspects of the Rule.

■ Mr. Cortinez cites *Colvin v. Committee on Professional Conduct, supra,* in support of his argument that the Committee should have specifically referenced his failure to return Mr. David's papers to him. In the *Colvin* case, we held that notice was inadequate when the attorney was notified of possible violations of certain rules but not the one of which he was found to be in violation. Here, there was clear notice of the allegations concerning the Rule ultimately found to have been violated.

### b. Lack of evidence

Mr. Cortinez argues that the Committee's finding that Mr. Cortinez failed to return Mr. David's papers to him is clearly erroneous. He says he did not have any papers regarding the wrongful-termination case to which Mr. David was entitled and notes his testimony at the hearing in which he stated that he presented the documents that Mr. David gave him to the Administrative Law Judge at the unemployment-compensation hearing and that there was not any separate documentation regarding the wrongful-discharge case. He also notes that the Committee failed to indicate what papers he failed to return to Mr. David and that the

record does not show that Mr. David asked that the file be returned to him.

█ There is evidence from which the Committee could have found that Mr. Cortinez had Mr. David's papers in his possession and failed to return them. Mr. Cortinez stated that Mr. David gave him the termination letter from the Arsenal and the court memorandum regarding his non-judicial punishment at their April 15 meeting.

█ As to Mr. Cortinez's argument that the record does not provide any evidence that Mr. David sought the return of any papers, the clear language of the Rule does not require a demand from the client to trigger this obligation. It places an affirmative duty on the attorney, not the client, to protect the client's interests upon termination of representation.

Affirmed.